UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL WHITE, et al.,

    *Plaintiffs*,

v.

ISLAMIC REPUBLIC OF IRAN, et al.,

    *Defendants*.

Civil Action No. 1:22-cv-00740 (CJN)

### SEALED MEMORANDUM OPINION

Michael White was abducted and tortured in Iran after being lured into the country by a woman he met online. *See generally* Michael White Decl., ECF No. 23-3. Together with his mother and two of his brothers, White sued Iran using the state sponsor of terrorism exception in the Foreign Sovereign Immunities Act. Iran has failed to appear. For the reasons discussed below, the Court GRANTS the Whites' motion for default judgment.

### I. Background

#### A. Relevant Findings of Fact

**1. White's Imprisonment**

White is a U.S. citizen and Navy veteran. In 2012, he met an Iranian woman named Samaneh Abbasi online. White Decl. ¶ 5. He thereafter made visits to Iran to meet her. At the end of one of those trips in 2018, he was abducted on his way to the airport. *Id.* ¶ 17. White's car was blocked and three men pulled him out, blindfolded him, handcuffed him, and forced him into their car. *Id.* ¶ 17.

White eventually ended up in Vakilabad Prison, where he was held in solitary confinement from July 22, 2018 until September 18, 2018. *Id.* ¶¶ 18-29. During his solitary confinement,

White was beaten, punched, starved, assaulted, whipped at the bottom of his feet, threatened with a pistol, forced to stay in stressful positions for hours at a time, and repeatedly tripped while blindfolded and handcuffed. *Id.* ¶ 20. His tiny cell was frigid, infested with sewer roaches, and stank of feces and urine. *Id.* ¶ 18. He was deprived of food for up to three days at a time. *Id.* ¶ 18. And he suffered from chronic weakness, nausea, and gastro-intestinal problems. *Id.* ¶ 18.

White left the cell only for interrogations. *Id.* ¶ 18. The interrogators—who identified themselves as Iranian Revolutionary Guard Corps intelligence—attempted to force White to confess to being a U.S. spy. *Id.* ¶ 21. Their efforts to coerce a confession included threatening him with pistols and stun guns; depriving him of food, water, and a blanket; and pouring buckets of cold water on him while he slept. *Id.* ¶ 22. White became suicidal and even attempted to hang himself with his prison clothes before guards rushed in and aborted the attempt. *Id.* ¶ 29.

On September 18, 2018, White was transferred to a new part of Vakilabad Prison. *Id.* ¶ 30. There, he was held in a 16-by-30-foot cell that contained about 40 prisoners but only 27 bunks. *Id.* ¶ 34. The cell was covered in a black mold, infested with cockroaches, and smelled of dirt, sweat, feces, and urine. *Id.* ¶ 34. And the cell was constantly lit by a bright light, day and night. *Id.* ¶ 34.

White was sexually assaulted by guards. One guard "grabbed [him], pressed his genitals against [him] and humiliated and taunted [him] in front of the other prisoners." *Id.* ¶ 36. Another guard "pulled on [White's] pants until [his] genitals were exposed." *Id.* ¶ 36. On another occasion, a guard "took his hand and intentionally grabbed [White's] naked rear and [his] genitals." *Id.* ¶ 56. And "[s]omeone threatened to rape" White. *Id.* ¶ 36.

Eventually, on March 19, 2020, White was transferred from Vakilabad on a "medical furlough" negotiated by the Swiss and American governments. *Id.* ¶¶ 58-59. White remained in Swiss-leased quarters in Tehran until his release on June 4, 2020. *Id.* ¶ 60.

### 2. Purpose of Detention

White's detention was "part of a longstanding [Iranian] state policy and practice of using hostage-taking and torture for the purpose of extracting advantage in international relations." Kholdi Rep. at 23, ECF No. 23-5. And sure enough, White became part of "an explicit prisoner exchange." Levitt Rep. at 18, ECF No. 23-4. The terms were discussed for "months." *Id.* According to the former governor of New Mexico, Bill Richardson, who "served as a private negotiator for" White's release, Iran asked for the release of two Iranians "in return for" White. *Id.* And ultimately, the first requested Iranian was released by the U.S. two days before White's release, and the second was released by the U.S. days afterwards. *Id.* As one of White's experts puts it, it is "clear" that "White was held for the purpose of third-party compulsion, specifically to extract political and other benefits from the United States government." *Id.* at 17.

### 3. Post-Release Suffering

White remains psychologically damaged from the experience. He has post-traumatic stress disorder, Exhibit E, White Decl, and suffers a number of continuing symptoms that impact every aspect of his life. White Decl. ¶ 65-75; *see generally* Louria Rep., ECF No. 23-13. His mother and two brothers also suffered and continue to suffer severe emotional pain. *See* Joanne White Decl., ECF No. 23-8; Steven White Decl., ECF No. 23-9; Jeremy White Decl., ECF No. 23-10.

### B. Procedural Background

Together with his mother and two brothers, White sued Iran under 28 U.S.C. § 1605A(c)'s right of action against state sponsors of terrorism. *See* Compl., ECF No. 1. White seeks money damages under common law claims for assault, battery, intentional infliction of emotional distress,

3

and false imprisonment. *Id.* His mother and brothers seek solatium—an award for their own pain and suffering stemming from Iran's actions. *Id.*

Iran was properly served on November 1, 2022.[1] *See* ECF Nos. 17, 18. But Iran never appeared or responded to the complaint, and the Clerk of the Court entered default on December 8, 2022. *See* ECF No. 20. The Whites then moved for entry of default judgment.

## II.   Legal Standards

Courts are permitted to enter default judgments against parties who fail to appear before them. Fed. R. Civ. P. 55(b)(2). But the "entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). The Court has the "affirmative obligation" to ensure that it has subject-matter jurisdiction over the action and personal jurisdiction over the defendant. *See Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121 133 (D.D.C. 2021) (citation omitted).

Additionally, "[w]hen default judgment is sought under the FSIA, a claimant must 'establish[] his claim or right to relief by evidence satisfactory to the court.'" *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 42 (D.D.C. 2018) (quoting 28 U.S.C. § 1608(e)). "In a FSIA default proceeding, a court can find that the evidence presented is satisfactory "when the plaintiff shows 'her claim has some factual basis,' . . . even if she might not have prevailed in a contested proceeding." *Sotloff*, 525 F. Supp. 3d at 134 (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)). "[U]ncontroverted factual allegations supported by admissible evidence may be taken as true." *Id.* And in assessing whether to enter

---

[1] Consistent with the requirements of 28 U.S.C. § 1608(a)(4), the Clerk of Court mailed "two copies of the summons and complaint and a notice of suit, together with a translation of each" to the United States Department of State for service to be effected through diplomatic channels. *See* ECF Nos. 16, 17, 18.

4

default judgment, the Court can rely on a plaintiff's affidavits and declarations. *Owens*, 864 F.3d at 785.

### III.   Analysis

Based on the above findings of fact, the Court makes the following conclusions of law.

### A.   Jurisdiction

The Court has subject-matter, original, and personal jurisdiction over this action.

**1.   Subject-Matter Jurisdiction**

The FSIA state-sponsored-terrorism exception provides federal courts with subject-matter jurisdiction over cases "in which money damages are sought against a foreign state for personal injury or death that was caused by" certain acts of terrorism against U.S. nationals. 28 U.S.C. § 1605A(a)(1)–(2). The Whites must prove four elements to establish subject-matter jurisdiction: (1) Iran "was designated a state sponsor of terrorism when the act of terrorism occurred and when this action was filed;" (2) the Whites were U.S. nationals at the time of the acts of terrorism; (3) the Whites afforded Iran a reasonable chance to arbitrate their claims; and (4) Iran's actions qualify under the terrorism exception of the FSIA as defined in 28 U.S.C. § 1605A(a)(1). *See Sotloff*, 525 F. Supp. 3d at 134; 28 U.S.C. § 1605A(a)(1)–(2). The Whites have proven all four elements.

First, Iran was a designated state-sponsor of terrorism at all relevant times. The United States first designated Iran as a state-sponsor of terrorism in 1984. *See Rezaian*, 422 F. Supp. 3d at 175. The United States has continued to do so since, including during the time of White's imprisonment and when he filed this suit. *See* State Sponsors of Terrorism, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism/.

Second, all of the Whites were U.S. citizens at the relevant times. *See* ECF Nos. 23-3, 23-8, 23-9, 23-10. They were therefore U.S. nationals within the meaning of the FSIA. *See* 28 U.S.C. § 1605A(h)(5); 8 U.S.C. § 1101(a)(22).

Third, the Whites offered to arbitrate their claims. "The FSIA does not require any particular form of offer to arbitrate, simply the extension of a reasonable opportunity." *Sotloff*, 525 F. Supp. 3d at 135 (citations omitted). The Whites included with the summons and complaint, an "Offer to Arbitrate." *See* ECF No. 18. That fulfilled the Whites' duty to extend a "reasonable opportunity" to Iran to arbitrate.

Finally, Iran's actions qualify under the terrorism exception of the FSIA. *See* 28 U.S.C. § 1605A(a)(1). "The fourth element of subject-matter jurisdiction under the FSIA terrorism exception is that the plaintiffs seek [money] damages for personal injury or death caused by the foreign state's commission of at least one terrorist act enumerated in the statute, including 'torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act.'" *Sotloff*, 525 F. Supp. 3d at 135 (quoting 28 U.S.C. § 1605A(a)(1)).

The Whites seek money damages. *See* 28 U.S.C. § 1605A(c) ("[money] damages may include economic damages, solatium, pain and suffering, and punitive damages"),

They also have clearly demonstrated that Michael suffered hostage taking and torture at the hands of Iran. Start with hostage taking, which the FSIA defines by reference to Article 1 of the International Convention against the Taking of Hostages, which states:

> Any person who seizes or detains and threatens to kill, to injure[,] or to continue to detain another person . . . in order to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offense of taking of hostages . . . .

28 U.S.C. § 1605A(h)(2); International Convention Against the Taking of Hostages art. 1, Dec. 17, 1979, 18 I.L.M. 1456, 1316 U.N.T.S. 205. Hostage taking has two elements: (1) abduction or detention and (2) the purpose of accomplishing the third-party compulsion described in the definition provided by the Convention. *See Sotloff*, 525 F. Supp. 3d at 135.

6

The Whites have satisfied both elements. Michael was abducted and detained by the Revolutionary Guard. *See supra* pp. 1-3. And the purpose of Michael's captivity and detention was to accomplish third-party compulsion—indeed, Iran succeeded in using Michael to extract a prisoner exchange with the U.S. *See supra* p. 3.

The Whites have also demonstrated that Michael was tortured. The FSIA defines "torture" by reference to the Torture Victim Protection Act. 28 U.S.C. § 1605A(h)(7). Under that statute,

> (1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and
>
> (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—
>   (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
>   (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
>   (C) the threat of imminent death; or
>   (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Torture Victim Protection Act of 1991 § 3(b), Pub. L. No. 102-256, 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350 (note). "To establish torture, the plaintiffs must also show that the conduct was sufficiently severe and purposeful." *Sotloff*, 525 F. Supp. 3d at 137; *see also Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002) (identifying two measures of

what constitutes torture as (1) "the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim" and (2) the extent to which the "production of pain is purposive.").

The facts found above demonstrate that this standard was met regarding Iran's treatment of Michael. *See supra* p. 1-3. There is moreover "well-documented evidence" that Iran "use[s] torture against detainees in Iranian prisons." Levitt Rep. at 22. And "[k]ey portions of [Michael's] account of his detention and mistreatment at the hands of Iranian security agencies were corroborated by people who were detained in the same prison as him." *Id.* at 20.

### 2. Original Jurisdiction

Under 28 U.S.C. § 1330, federal district courts have original jurisdiction over FSIA claims that are (1) nonjury civil actions (2) for claims seeking relief *in personam* (3) against a foreign state (4) when the foreign state is not entitled to immunity under 28 U.S.C. §§ 1605, 1606, 1607, or any applicable international agreement. *See* 28 U.S.C. § 1330(a). The Whites have not sought a jury trial, *see generally* Compl.; the suit is brought against Iran in its capacity as a legal person, not against property; Iran is a foreign state; and Iran is not entitled to sovereign immunity because this action falls under the state-sponsored-terrorism exception in the FSIA, *see supra* pp. 5-8. The Court therefore has original jurisdiction.

### 3. Personal Jurisdiction

To impose judgment on a foreign state under the FSIA, the Court must also have personal jurisdiction. *Sotloff*, 525 F. Supp. 3d at 140. The Court has personal jurisdiction over Iran if (1) the Court has original jurisdiction under the FSIA; and (2) Iran was properly served under the FSIA. *See* 28 U.S.C. § 1330(b). As already explained, the Court has original jurisdiction, *see supra* p. 8, and Iran was properly served, *see supra* p. 4 & n. 1.

### B.  Liability

The FSIA creates a private right of action for victims of state-sponsored terrorism.  28 U.S.C. § 1605A(c).  "The right of action requires a demonstration (1) that the victim suffered an act of torture, extrajudicial killing, aircraft sabotage, or hostage taking . . . ; (2) that the act was committed . . . by the foreign state or its agent; and that the act (3) caused (4) personal injury or death (5) for which the courts of the United States may maintain jurisdiction under this section for money damages." *Mueller v. Syrian Arab Republic*, 656 F. Supp. 3d 58, 77 (D.D.C. 2023) (cleaned up).  "The third and fourth prongs require [the Whites] to articulate a way to recover through the lens of civil-tort liability." *Id.* (citations omitted)

"Having already concluded that the Court possesses subject-matter jurisdiction, little else is needed to show that [the Whites are] entitled to relief."  *See Sotloff*, 525 F. Supp. 3d at 141 (citing 28 U.S.C. § 1605A(c)).  As explained above, the evidence establishes that White was the victim of hostage taking and torture at the hands of Iran and that the Court has jurisdiction.

All that is left is whether each plaintiff has satisfied the third and fourth elements—which, again, are evaluated "through the lens of civil-tort liability."  *Mueller*, 656 F. Supp. 3d at 77 (citations omitted).  "The elements of causation and injury in the federal cause of action created by § 1605A require FSIA plaintiffs to prove a theory of liability which justifies holding the defendants culpable for the injuries that the plaintiffs allege to have suffered."  *Fain*, 856 F. Supp. 2d at 122 (quotation omitted).  "Based on the Circuit Court's guidance, District Courts in this jurisdiction 'rely on well-established principles of law, such as those found Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions' to outline the boundaries of these theories of recovery."  *Mueller*, 656 F. Supp. 3d at 78 (citations omitted).

Start with White. He asserts four possible claims for relief: assault, battery, intentional infliction of emotional distress, and false imprisonment. *See* Compl. ¶¶ 81-101.

An assault occurs when a person "(a) 'acts intending to cause a harmful or offensive contact with the person . . . or an imminent apprehension of such a contact, and (b) the [person] is thereby put in such imminent apprehension.'" *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 343 (D.D.C. 2016) (quoting Restatement (Second) of Torts § 21). "By their very nature, torture and hostage taking subject the victim to 'imminent apprehension of harmful or offensive contact' at all times while in captivity." *Abedini*, 422 F. Supp. 3d at 132; *see also id.* at 132–33 ("Thus, hostages who are tortured or threatened withstand a continuous . . . tortious assault that infects every moment of their captivity." (citations omitted) (alteration adopted)). "Given the facts recounted above," Iran is "plainly liable for assault." *See id.* at 133.

Battery occurs when "(1) 'acts [are] intend[ed] to cause a harmful or offensive contact with [a person] . . . or [cause] an imminent apprehension of such a contact, and (2) a harmful contact with [that person] directly or indirectly results.'" *Stansell*, 217 F. Supp. 3d at 342 (quoting Restatement (Second) of Torts § 13). "'Harmful contact' includes 'any physical impairment of the condition of another's body, or physical pain or illness.'" *Abedini*, 422 F. Supp. 3d at 133 (quoting Restatement (Second) of Torts § 15). "Acts of torture—like those [White] endured—undeniably meet this bar." *See id.* Therefore, this Court "has little difficulty concluding that the IRGC repeatedly battered" White. *See id.*

An actor is liable for intentional infliction of emotional distress if "by extreme and outrageous conduct [he] intentionally or recklessly causes severe emotional distress to another." Restatement (Second) of Torts § 46; *Abedini*, 422 F. Supp. 3d at 133. "Torture, by definition, involves 'extreme and outrageous' conduct." *Abedini*, 422 F. Supp. 3d at 133. White certainly

10

suffered severe emotional distress because of his hostage taking and torture. *See* Decl. at 7, 10–11. And "Iran's actions were intentional—indeed, they were an attempt to compel the U.S. to release Iranian prisoners," *see Abedini*, 422 F. Supp. 3d at 133; *supra* p. 3, and coerce a confession, *see supra* p. 2. Therefore, White has demonstrated that Iran can be held liable for intentional infliction of emotional distress.

Finally, false imprisonment occurs when "(a) [an actor] acts intending to confine a person within fixed boundaries, . . . (b) his act directly or indirectly results in such a confinement of the other, and (c) the victim is conscious of the confinement or is harmed by it." *Abedini*, 422 F. Supp. 3d at 133 (alterations adopted) (quoting Restatement (Second) of Torts § 35). Iran's imprisonment of White certainly meets this standard. *See supra* pp. 1-3.

Now turn to White's mother and two brothers, who allege a solatium theory. *See* Compl. ¶¶ 102-104. Loss of solatium is "the mental anguish, bereavement, and grief" experienced by those with a close relationship to the victim. *Est. of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 140 (D.D.C. 2018) (cleaned up). "Under the FSIA, a solatium claim is indistinguishable form an intentional infliction of emotional distress (IIED) claim." *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 34 (D.D.C. 2022). "Courts apply the Restatement (Second) of Torts to these claims." *Id.*

Iran is liable if it "by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to" the Whites. *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 81 (D.D.C. 2017) (cleaned up) (quoting Restatement (Second) of Torts § 46(1)). While White's relatives were not "present at the time" of his detention and torture, they can still recover because they are "members of [his] immediate family" and Iran's "conduct [was] sufficiently outrageous and intended to inflict severe emotional harm upon" them. *Braun*, 228 F. Supp. 3d at 81 (citations

omitted); *see also Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 179 (D.D.C. 2019). White's mother and brothers have all suffered severe emotional distress due to his arrest and detention in Iran. *See supra* p. 3. "There is no question that Iran detained and tortured [Michael] intentionally." *Rezaian*, 422 F. Supp. 3d at 179. "And both hostage taking and torture have been deemed sufficiently outrageous to inflict severe emotional harm on family members who were not present." *Id.*; *see also Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 28 (D.D.C. 2016) (explaining that there is a "presumption that family members in direct lineal relationship suffer compensable mental anguish and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages" (cleaned up)).

### C. Damages

The FSIA expressly allows plaintiffs "to pursue 'economic damages' and those for 'pain and suffering.'" *Abedini*, 422 F. Supp. 3d at 136 (quoting 28 U.S.C. § 1605A(c)). "To obtain damages for an FSIA claim, 'a plaintiff must prove that the consequences of the defendants' acts were reasonably certain to occur, and [he] must prove the amount of damages by a reasonable estimate.'" *Id.* (quoting *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 69 (D.D.C. 2015)). It is unquestionable that Iran's actions of hostage taking and torture were "reasonably certain" to injure White and his family. The Court therefore considers whether the Whites' proposed damages are reasonable estimates.

**1. White's Damages**

 *a. Pain and Suffering*

As compensation for his pain and suffering, White asks for $6,830,000 in pre-release damages and $10,000,000 in post-release damages.

"In hostage-taking cases, this district applies a per-diem formula—awarding $10,000 per day of captivity—to compensate for injuries sustained while imprisoned." *Abedini*, 422 F. Supp.

3d at 136. "This case presents no reason to deviate from the accepted approach." *Rezaian*, 422 F. Supp. 3d at 180. Because White was detained for 683 days, the Court awards him the requested amount in pre-release damages.

As for post-release damages, "[a]lthough no [similar] formula exists for calculating [these] damages, awards granted to similarly situated plaintiffs in FSIA lawsuits help guide the Court through this delicate terrain." *Abedini*, 422 F. Supp. 3d at 137. "Central to determining the amount of these sums are 'the victim's age at the time of release (the length of time he will be experiencing pain and suffering) and the extent of the victim's long-term injuries (the level of pain and suffering).'" *Id.* (quoting *Hekmati*, 278 F. Supp. 3d at 164).

White proposes an award of $10,000,000 in post-release damages because, he contends, his level of pain and suffering is comparable to the plaintiff in *Rezaian*. Rezaian was 40 when he was released and received $10,000,000 for post-release pain and suffering following his 544-day captivity. *Rezaian*, 422 F. Supp. 3d at 180. The Court agrees that Rezaian is a comparable analogue and awards Michael $10,000,000 for post-release pain and suffering damages.

        b.      *Economic Damages*

White seeks $813,181 in damages for lost earnings. "Establishing a reasonable estimate of lost earnings through persuasive expert analysis supported by sound factual bases has been deemed sufficient." *Rezaian*, 422 F. Supp. 3d at 181. His experts' estimate of $813,181 in lost earnings is reasonable. A vocational expert opined on White's career prospects. *See* Vargas Rep., ECF No. 23-11. She assessed his work capacity by interviewing him, reviewing evidence of his current psychological condition, and assessing his work history. *Id.* She concluded that "it is more likely than not that" White "is unable to secure and follow substantially gainful employment, including unskilled sedentary employment." *Id* at 7. And an economic expert used that information, combined with White's expected wage progression pre-detention, to determine the

13

lost wages he suffered as a result of his detention. *See* Willoughby Rep., ECF No. 23-12. The Court therefore concludes that White has established his entitlement to $813,181 in damages for lost earnings.

Combined with his non-economic damages of $16,830,00, White's total compensatory award is $17,643,181.

**2. Solatium Damages**

For cases like this, "this district has developed a standard damages award for the pain and suffering experienced by family members." *Rezaian*, 422 F. Supp. 3d at 181. Under the standard framework, as a baseline, a victim's parent is entitled to $2,500,000 and a sibling to $1,250,000. *See id.* "These baseline awards can be enhanced," however, "in cases with aggravating circumstances." *Id.* (citations omitted).

The Whites argue for a 50% increase from the baseline. They are correct that aggravating circumstances are present here—in particular, this case involves "torture [and] kidnapping" and "the victim survives with severe physical and emotional conditions that continue to cause" his family "severe suffering." *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (2006). But "departures from the baseline damages award are usually relatively small." *Rezaian*, 422 F. Supp. 3d at 181 (cleaned up). Based on its assessment of the family members' declarations, the Court concludes that a 10% departure is warranted for White's mother and a 5% departure is warranted for each of his brothers. As a result, White's mother is entitled to $2,750,000 and his brothers are each entitled to $1,312,500.[2]

---

[2] The Whites make a brief request for prejudgment interest on the pain and suffering and solatium components of their compensatory damages. While the Court agrees that prejudgment interest for those components of the compensatory damages award is likely appropriate (because the Whites were entitled to those awards from the time of the injuries), the Whites have given the Court no basis for appropriately calculating prejudgment interest. (For example, is the relevant date for each award the date of Michael's kidnapping, the date of his release, or some other date? Should

### 3. Punitive Damages

"The final category of damages at issue is punitive damages," which "are awarded not to compensate the victims, but to punish outrageous behavior and deter such outrageous conduct in the future." *Rezaian*, 422 F. Supp. 3d at 183 (citations omitted). "Courts have repeatedly held, in section 1605A cases, that Iran's actions were outrageous, and imposed substantial punitive damages awards as a result." *Id.* And the Court agrees with previous decisions that "[h]olding a man hostage and torturing him to gain leverage in negotiations with the United States is outrageous, deserving of punishment, and surely in need of deterrence." *Id.*

Much harder than the question of *whether* to award punitive damages is the question of *how much*. "To calculate punitive damages awards in section 1605A cases, courts consider (1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Id.* (quotations omitted). But "[e]mployment of these factors has yielded several different methods of determining the ultimate award." *Id.* Some courts have multiplied the foreign state's annual expenditures on terrorism by a factor between three and five; others have awarded each affected family a fixed amount of $150,000,000; and others have awarded punitive damages in an amount equal to the total compensatory damages. *See id.* (citing cases).

The Whites ask for $150,000,000. But for many of the same reasons given in *Abedini*, the "Court believes that the most appropriate method is . . . making punitive damages equal to compensatory damages." *Abedini*, 422 F. Supp. 3d at 142; *see also Mark*, 626 F. Supp. 3d at 46;

---

prejudgment interest be calculated using the prime rate or the Treasury Bill rate or some other rate? What are those rates?). The Court therefore will not award prejudgment interest.

*Saberi*, 541 F. Supp. 3d at 87. Thus, each plaintiff will be awarded punitive damages equal to his or her compensatory damage award.

## IV.   Conclusion

The Whites' motion for default judgment is GRANTED. A separate order consistent with this decision will be issued contemporaneously.

DATE: August 6, 2024

CARL J. NICHOLS
United States District Judge